UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT DAVYDOV, Derivatively on Behalf of SYNERGY PHARMACEUTICALS INC., | Case No. |
| Plaintiff, | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, |
| v. | BREACH OF FICUIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST |
| TROY HAMILTON, GARY S. JACOB, GARY G. GEMIGNANI, MARINO GARCIA, MELVIN K. SPIGELMAN, JOHN P. BRANCACCIO, THOMAS H. ADAMS, ALAN F. JOSLYN, RICHARD J. DALY, and TIMOTHY S. CALLAHAN, | ENRICHMENT |
| Defendants, | |
| -and- | |
| SYNERGY PHARMACEUTICALS INC., a Delaware corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for

Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust

Enrichment.   Plaintiff alleges the following on information and belief, except as to the

allegations specifically pertaining to plaintiff which are based on personal knowledge.   This

complaint is also based on the investigation of plaintiff's counsel, which included, among other

things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC")

and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal

defendant Synergy Pharmaceuticals Inc. ("Synergy" or the "Company") against certain of its

officers and directors for violation of securities law, breach of fiduciary duty, waste of corporate

assets, and unjust enrichment.  These wrongs resulted in more than a hundred million dollars in damages to Synergy's reputation, goodwill, and standing in the business community.  In addition, these actions have exposed the Company to more than one hundred million dollars in potential liability for violations of federal and state law.

2.       Synergy is a biopharmaceutical company that focuses on developing and commercializing gastrointestinal therapies.   In January 2017, the U.S. Food and Drug Administration ("FDA") approved Synergy's first and only commercial product, plecanatide, under the trademark name "TRULANCE®."   TRULANCE is a therapeutic agent for the treatment of chronic idiopathic constipation ("CIC") in adult patients.  According to Synergy's most recent Annual Report, approximately thirty-three million adults suffer from CIC in the United States alone.

3.       Since TRULANCE's approval for the treatment of CIC in January 2017, the Individual Defendants (as defined herein) have repeatedly and brazenly misrepresented the efficacy and safety of TRULANCE.   Specifically, the Individual Defendants repeatedly misrepresented that TRULANCE had a superior side-effect profile to its competitors, Amitiza and Linzess.  In reality, TRULANCE's side-effect profile is not superior to its competitors, especially with respect to diarrhea, the most common and serious side effect of TRULANCE.

4.       Synergy began distributing TRULANCE in March 2017.  Unfortunately, revenues from TRULANCE were insufficient to fully fund Synergy.  On September 5, 2017, Synergy announced that the Company had closed on a $300 million debt financing structured as senior secured term loan from CRG Servicing LLC, a healthcare-focused investment firm ("CRG" and the "CRG Loan").  The CRG Loan granted Synergy up-front funding of $100 million with a second $100 million tranche less than six months later, on or before February 28, 2018, and a

third tranche of up to $100 million in the following thirteen months.  The Individual Defendants claimed that the CRG Loan would fund the Company's operations through 2019 without stockholder dilution.  Unbeknownst to investors, the CRG Loan agreement contained critical conditions precedent required to be satisfied in order for Synergy to access the additional tranches of the CRG Loan.  Specifically, the terms of CRG's Loan conditioned the second tranche of $100 million financing on Synergy having cash or cash equivalents "equal to or greater than $128 [million]" by January 31, 2018.

5.     The truth began to emerge on November 9, 2017, when the Company filed its Quarterly Report with the SEC for the third quarter ended September 30, 2017, attaching the CRG Loan as an exhibit to thereto.  Then, on November 13, 2017, only two months after the Company assured the investing public that the CRG Loan would fund TRULANCE's commercialization without stockholder dilution, Synergy shocked the market when it announced a share offering to help "fund its commercialization activities related to TRULANCE."  Analysts described this dilutive capital increase as "unexpected" and "blindsiding."

6.     In addition, in 2017, the Director Defendants issued a materially misleading Proxy Statement (the "2017 Proxy"), urging stockholders to vote to reelect the directors, approve an amendment to Synergy's Second Amended and Restated Certificate of Incorporation ("Certificate of Incorporation"), and approve an equity incentive plan, among other things.  In seeking stockholder votes in accord with the Synergy Board of Directors' (the "Board") recommendations, the 2017 Proxy highlighted that the Board engaged in operational risk oversight, the Audit Committee exercised oversight of the Company's financial statements, and the Compliance Committee implemented a "robust and effective compliance program."  Through these statements, certain of the Individual Defendants misleadingly claimed that the Board: (i)

maintained sufficient compliance, internal control, disclosure review, and reporting programs to identify and address wrongdoing; (ii) was well informed of the Company's financial condition through myriad information channels; and (iii) promoted prudent risk management practices.  In reality, the Board, Audit Committee, and Compliance Committee did not exercise active and appropriate oversight over the Company's corporate governance, risk management, and financial statements.

7.     The Individual Defendants' actions have devastated Synergy, as is evident from the more than 30% stock drop which wiped out over $145 million of the Company's market capitalization in only a few days.  Moreover, as a direct result of this unlawful course of conduct, the Company is now the subject of at least three securities class action lawsuits filed in the U.S. District Court for the Eastern District of New York on behalf of investors who purchased Synergy's shares (the "Securities Class Actions").  The Securities Class Actions allege violations of the federal securities laws in connection with certain false statements concerning TRULANCE and the ability of the Company's CRG Loan to fund its operations through 2019.

8.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

9.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this

District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Synergy, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Robert Davydov was a stockholder of Synergy at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Synergy stockholder.

**Nominal Defendant**

13.     Nominal defendant Synergy is a Delaware corporation with principal executive offices located at 420 Lexington Avenue, Suite 2012, New York, New York.  Synergy is a biopharmaceutical company focused on the development and commercialization of novel gastrointestinal therapies.  The Company's first and only commercial product, plecanatide, is available and marketed in the United States under the trademark name TRULANCE, for the treatment of adults with CIC and irritable bowel syndrome with constipation.  As of March 1, 2018, the Company had 313 employees.

**Defendants**

14.    Defendant Troy Hamilton ("Hamilton") is Synergy's Chief Executive Officer ("CEO") and has been since December 2017 and a director and has been since January 2018. Defendant Hamilton was also Synergy's Executive Vice President from February 2016 to December 2017; Chief Commercial Officer from July 2015 to December 2017 and Senior Vice President from July 2015 to February 2016.  Defendant Hamilton is named as a defendant in certain of the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Hamilton knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning:   (i) TRULANCE's side-effect profile; and (ii) the ability of the CRG debt financing to "execute on the launch of TRULANCE" and fund the Company's operations through 2019.  Synergy paid defendant Hamilton the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | Total |
|------|--------|-------|---------------|-------|
| 2017 | $398,513 | $166,725 | $1,243,556 | $1,808,794 |
| 2016 | $390,000 | $177,500 | $527,682 | $1,095,182 |

15.    Defendant Gary S. Jacob ("Jacob") is Synergy's Executive Chairman and has been since December 2017 and a director and has been since July 2008.  Defendant Jacob was also Synergy's Chairman from September 2013 to December 2017 and President and CEO from July 2008 to December 2017.  Defendant Jacob was a member of Synergy's Compliance Committee from at least December 2016 to at least April 2017.  Defendant Jacob is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Jacob knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning:   (i) TRULANCE's side-effect profile; and (ii) the ability of the CRG debt financing to "execute on the launch of

TRULANCE" and fund the Company's operations through 2019.   Defendant Jacob also negligently violated section 14(a) of the Exchange Act by causing Synergy to make misleading statements in its 2017 Proxy.   Synergy paid defendant Jacob the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|------|--------|-------|---------------|------------------------|-------|
| 2017 | $556,200 | $562,034 | $2,851,899 | $31,542 | $4,001,675 |
| 2016 | $538,100 | $305,910 | $1,706,170 | - | $2,550,180 |

16.     Defendant Gary G. Gemignani ("Gemignani") is Synergy's Executive Vice President and Chief Financial Officer and has been since April 2017.   Defendant Gemignani is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant Gemignani knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) TRULANCE's side-effect profile; and (ii) the ability of the CRG debt financing to "execute on the launch of TRULANCE" and fund the Company's operations through 2019. Synergy paid defendant Gemignani the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | Total |
|------|--------|-------|----------------|-------|
| 2017 | $290,417 | $124,375 | $967,443 | $1,382,235 |

17.     Defendant Marino Garcia ("Garcia") is Synergy's Executive Vice President and Chief Strategy Officer and has been since March 2016.   Defendant Garcia was also Synergy's Senior Vice President, Corporate Development from March 2014 to March 2016.   Defendant Garcia is named as a defendant in certain of the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant Garcia knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) TRULANCE's side-effect profile; and (ii) the ability of the CRG debt

financing to "execute on the launch of TRULANCE" and fund the Company's operations through 2019. Synergy paid defendant Garcia the following compensation as an executive:

| Year | Salary | Bonus | Total |
|------|--------|-------|-------|
| 2017 | $360,833 | $136,800 | $497,633 |

18.     Defendant Melvin K. Spigelman ("Spigelman") is Synergy's Lead Independent Director and has been since at least December 2016 and a director and has been since August 2008. Defendant Spigelman is also a member of Synergy's Audit Committee and has been since at least April 2016. Defendant Spigelman knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) TRULANCE's side-effect profile; and (ii) the ability of the CRG debt financing to "execute on the launch of TRULANCE" and fund the Company's operations through 2019. Defendant Spigelman also negligently violated section 14(a) of the Exchange Act by causing Synergy to make misleading statements in its 2017 Proxy. Synergy paid defendant Spigelman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|-------------|-------------------|---------------|-------|
| 2017 | $82,500 | $170,388 | $252,888 |
| 2016 | $75,750 | $109,934 | $185,684 |

19.     Defendant John P. Brancaccio ("Brancaccio") is a Synergy director and has been since July 2008. Defendant Brancaccio is also Chairman of Synergy's Audit Committee and a member of that committee and has been since at least April 2016 and a member of the Compliance Committee and has been since at least April 2018. Defendant Brancaccio knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) TRULANCE's side-effect profile; and (ii) the ability of the CRG debt financing to "execute on the launch of TRULANCE" and fund the Company's operations through 2019. Defendant Brancaccio also negligently violated section 14(a) of the Exchange Act by

causing Synergy to make misleading statements in its 2017 Proxy. Synergy paid defendant Brancaccio the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
| --- | --- | --- | --- |
| 2017 | $80,000 | $170,388 | $250,388 |
| 2016 | $79,125 | $109,934 | $189,059 |

20. Defendant Thomas H. Adams ("Adams") is a Synergy director and has been since July 2008. Defendant Adams knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) TRULANCE's side-effect profile; and (ii) the ability of the CRG debt financing to "execute on the launch of TRULANCE" and fund the Company's operations through 2019. Defendant Adams also negligently violated section 14(a) of the Exchange Act by causing Synergy to make misleading statements in its 2017 Proxy. Synergy paid defendant Adams the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
| --- | --- | --- | --- |
| 2017 | $65,000 | $170,388 | $235,388 |
| 2016 | $62,250 | $109,934 | $172,184 |

21. Defendant Alan F. Joslyn ("Joslyn") is a Synergy director and has been since October 2009. Defendant Joslyn is also a member of Synergy's Compliance Committee and has been since at least December 2016. Defendant Joslyn knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) TRULANCE's side-effect profile; and (ii) the ability of the CRG debt financing to "execute on the launch of TRULANCE" and fund the Company's operations through 2019. Defendant Joslyn also negligently violated section 14(a) of the Exchange Act by causing Synergy to make misleading statements in its 2017 Proxy. Synergy paid defendant Joslyn the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $57,500 | $170,388 | $227,888 |
| 2016 | $51,250 | $109,934 | $161,184 |

22.     Defendant Richard J. Daly ("Daly") is a Synergy director and has been since June 2015.  Defendant Daly knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) TRULANCE's side-effect profile; and (ii) the ability of the CRG debt financing to "execute on the launch of TRULANCE" and fund the Company's operations through 2019.  Defendant Daly also negligently violated section 14(a) of the Exchange Act by causing Synergy to make misleading statements in its 2017 Proxy.  Synergy paid defendant Daly the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $70,000 | $170,388 | $240,388 |
| 2016 | $60,500 | $109,934 | $170,434 |

23.     Defendant Timothy S. Callahan ("Callahan") is a Synergy director and has been since June 2015.  Defendant Callahan is also Chair of Synergy's Compliance Committee and a member of that committee and has been since at least December 2016 and a member of the Audit Committee and has been since at least April 2016.  Defendant Callahan knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) TRULANCE's side-effect profile; and (ii) the ability of the CRG debt financing to "execute on the launch of TRULANCE" and fund the Company's operations through 2019.   Defendant Callahan also negligently violated section 14(a) of the Exchange Act by causing Synergy to make misleading statements in its 2017 Proxy.  Synergy paid defendant Callahan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $77,500 | $170,388 | $247,888 |
| 2016 | $64,250 | $109,934 | $174,184 |

- 10 -

24.     The defendants identified in ¶¶14-17 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶14-15, 18-23 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶18-19, 23 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶15, 21, 23 are referred to herein as the "Compliance Committee Defendants."   Collectively, the defendants identified in ¶¶14-23 are referred to herein as the "Individual Defendants."

<u>**DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

**Fiduciary Duties**

25.     By reason of their positions as officers, directors, and/or fiduciaries of Synergy and because of their ability to control the business and corporate affairs of Synergy, the Individual Defendants owed Synergy and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Synergy in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Synergy and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Synergy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Synergy, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.

27.     To discharge their duties, the officers and directors of Synergy were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Synergy were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in deceptive conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how Synergy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(e)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Synergy's Code of Business Conduct and Ethics**

28.     The Company has adopted an Amended and Restated Code of Business Conduct and Ethics (the "Code of Conduct"), which applies to all of the directors, officers, and employees of the Company. The Code of Conduct provides that directors and officers maintain fiduciary duties and "act at all times in the best interest of the Company and its shareholders." The Code of Conduct states:

**Maintain Fiduciary Duties**

Directors and executive officers must be loyal to the Company and must act at all times in the best interest of the Company and its shareholders and subordinate self-interest to the corporate and shareholder good. Directors and executive officers should never use their position to make a personal profit. Directors and executive officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

29.    Further, the Code of Conduct mandates that the Individual Defendants' activities comply with the law.  Specifically, the Code of Conduct states:

**Compliance with Laws, Rules and Regulations**

Directors and executive officers shall comply, and oversee compliance by employees, officers and other directors, with all laws, rules and regulations applicable to the Company, including insider-trading laws. Transactions in Company securities are governed by Company Policy entitled "Insider Trading Policy."

30.    In addition, Synergy's Code of Conduct provides that the Company's senior management is "primarily responsible for monitoring the Company's public disclosure."  With respect to the quality of Synergy's public disclosures, the Code of Conduct states:

**Quality of Public Disclosure**

The Company is committed to providing its shareholders with information about its financial condition and results of operations as required by the securities laws of the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Executive officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. The Company's senior management are primarily responsible for monitoring the Company's public disclosure.

**Additional Duties of the Audit Committee Defendants**

31.    Under the Synergy Board's Audit Committee Charter, the Audit Committee Defendants, defendants Brancaccio, Callahan, and Spigelman, owe and/or owed specific

additional duties to Synergy.  According to the Audit Committee Charter, among other things, the Audit Committee is responsible for assisting the Board in overseeing "Synergy's accounting and financial reporting processes and audits of its financial statements."  Further, the Audit Committee is responsible for monitoring and advising the Board on "the integrity of the Company's financial statements and disclosures," "the adequacy and effectiveness of the Company's internal controls," and "the Company's compliance with legal and regulatory requirements."  In addition, the Audit Committee is required to:

1. Review with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K

2. Review with management and the independent auditor the quarterly reports of the Company prior to filing of such reports with the SEC, including the results of the independent auditor's review of the quarterly financial statements.

3. Review with management and the independent auditor the Company's earnings press releases as well as financial information and earnings guidance provided to analysts, including the use of "pro forma" or "adjusted" non-GAAP information and its reconciliation to GAAP.

* * *

5. Review with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

* * *

10. Periodically review with the independent auditor, without management being present, (a) their judgments about the qualify, appropriateness, and acceptability of the Company's accounting principles and financial disclosure practices, as applied in its financial reporting, and (b) the completeness and accuracy of the Company's financial statements.

**Additional Duties of the Compliance Committee Defendants**

32.     Under the Board's Compliance Committee Charter, the Compliance Committee Defendants, defendants Brancaccio, Callahan, and Joslyn, owe and/or owed specific additional

duties to Synergy.  Specifically, among other things, the Compliance Committee was tasked with creating a company-wide culture of compliance, implementing a "robust and effective compliance program," and assisting the Board with "oversight of all matters related to [c]ompliance."   In reviewing and overseeing Company matters related to compliance, the Compliance Committee Charter tasked its members with ascertaining, monitoring, and evaluating: (i) significant potential compliance risks, issues, or developments, or patterns of noncompliance at the Company; (ii) the results of any compliance audits, reviews, or investigations conducted by the Company or by the Compliance Committee; (iii) the Company's response to any instance of significant noncompliance; and (iv) any other issues or concerns that could expose the Company to significant compliance risk.  In promoting a company-wide culture of compliance, the Compliance Committee is required to include and effectively implement the following in its Compliance program:

1. Designation of a Compliance Officer who reports directly to the Chief Executive Officer and this Committee and is subject to Board oversight;

2. Creation of a Compliance Committee, consisting of the Compliance Officer and other members of senior management, to support the Compliance Officer in the implementation and operation of the Company's Compliance Program;

3. Regular screening all employees, and all relevant third parties engaged by the Company, to ensure that no employee is hired, or relevant third party retained, who has been excluded, debarred, suspended or otherwise rendered ineligible to participate in federal health care programs;

4. A written Code of Conduct, policies and procedures that effectively address the Company's Compliance obligations. Such code, policies and procedures shall make compliance with those documents an element in the performance evaluations of all employees;

5. Regular Compliance education, training and communications to ensure that all officers, directors, employees and relevant agents of the Company are aware of and understand their Compliance obligations, as established in the Company's Code of Conduct, policies and procedures and otherwise;

6. A Compliance hotline, and other lines of communication to the Compliance Officer, that enables all officers, directors, employees, relevant agents of the Company and the public to submit Compliance questions and report Compliance concerns or suspected Compliance issues or violations;

7. Periodic Compliance risk assessments of relevant functional areas of the Company, and regular auditing and monitoring of those functional areas and activities of the Company that are relevant to the Compliance Program;

8. Development and publication within the Company of disciplinary guidelines for the enforcement of the Company's Compliance standards; and

9. Disciplinary procedures for the prompt response to detected instances of noncompliance and the implementation of appropriate corrective action, including the adoption of preventative measures and, where appropriate, the reporting of noncompliant activities to the relevant government authorities.

**Breaches of Duties**

33. Each Individual Defendant, by virtue of his position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Synergy, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of Synergy's Board during the time of the misconduct.

34. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, Synergy to make improper statements to the public and the Company's stockholders, an unlawful practice that wasted Synergy's assets

and caused the Company to incur substantial damage. The Individual Defendants also breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, Synergy to issue a misleading proxy statement.

35. The Audit Committee members had a duty to review the terms of the CRG Loan, as well as to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants therefore knew or were recklessly unaware of the terms of the CRG Loan, including the onerous preconditions that were not achievable by Synergy. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements and failing to properly oversee Synergy's public statements and internal control function.

36. The Compliance Committee members had a duty to create a Company-wide culture of compliance and assist the Board in its oversight responsibilities regarding all matters of compliance. The Compliance Committee Defendants breached their duty of loyalty and good faith by failing to properly oversee Synergy's public statements.

37. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Synergy, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of defendants' improper course of conduct, the Company is now the subject of the Securities Class Actions that allege violations of federal securities laws. As a result, Synergy has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did:  (i) deceive the investing public, including stockholders of Synergy, as to the Company's operations, financial condition, and future business prospects; and (ii) enhance the Individual Defendants' executive and directorial positions at Synergy and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements and mislead the investing public.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

44.     Synergy is a biopharmaceutical company that focuses on developing and commercializing gastrointestinal therapies.  On January 19, 2017, the FDA approved Synergy's first and only commercial product, plecanatide, under the trademark name "TRULANCE." TRULANCE is a once-daily therapeutic agent for the treatment of CIC in adult patients. According to the Company's most recent Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K"), filed with the SEC on March 1, 2018, an estimated thirty-three million adults suffer from CIC in the United States alone.

45.     People with CIC have persistent symptoms of difficult-to-pass and infrequent bowel movements.  In addition to physical symptoms including abdominal bloating and discomfort, CIC can adversely affect an individual's quality of life, including increasing stress levels and anxiety.  TRULANCE is intended to provide more regular, well-formed bowel

movements for adults with CIC.   According to the FDA's press release announcing TRULANCE's approval, diarrhea is the most common and serious side effect of TRULANCE.

46.     The CIC prescription market is worth just over $1 billion and growing. TRULANCE competes for a piece of this market with Amitiza and Linzess, two other prescription medications for the treatment of CIC.   According to the Company, TRULANCE offers several substantive advantages over the current standard of care.   Most notably, in public statements Synergy routinely touted TRULANCE's supposedly superior side-effect profile to its competitors,   specifically   with   respect   to   diarrhea,   the   most   common   adverse   event. Unfortunately, as the Company has recently revealed, TRULANCE does not in fact have a superior side-effect profile than its competitors.

47.     Synergy began marketing and distributing TRULANCE for the treatment of CIC in March 2017.   Unfortunately, revenues from TRULANCE were insufficient for Synergy to sustain operations.   On August 9, 2017, the Company announced that it was "evaluating financing options that will provide flexibility and allow [Synergy] to continue to execute on [its] business objectives."

## SUBSTANTIVE ALLEGATIONS

**The Individual Defendants Made or Allowed Synergy to Make Improper Statements in Breach of Their Fiduciary Duties**

48.     As detailed below, between November 2016 and November 2017, the Individual Defendants made or allowed the Company to make improper statements in its public filings concerning: (i) TRULANCE's apparent superior side-effect profile to its competitors; and (ii) Synergy's ability to commercialize TRULANCE and fund operations through 2019 without stockholder dilution through the CRG Loan.

**Improper Statements Concerning TRULANCE's Side-Effect Profile**

49.   On November 9, 2016, Synergy issued a press release summarizing the Company's financial and operating results for the third quarter of 2016.  In the press release, defendant Hamilton touted the "positive impact that plecanatide [would] have in the market place as a differentiated therapeutic option for patients with CIC."  The press release stated:

> "We are laser-focused on our key strategic imperatives of product readiness, market and brand readiness and organizational readiness," said Troy Hamilton, Executive Vice President and Chief Commercial Officer of Synergy Pharmaceuticals Inc. **"*Based on our extensive market research, advisory board meetings and interactions with payers, healthcare providers and patients to-date, we are very encouraged about the positive impact that plecanatide will have in the market place as a differentiated therapeutic option for patients with CIC.*** We are also pleased with the progress our technical operations team has made this year to ensure plecanatide product supply will be ready and available to physicians and patients by our anticipated launch early next year. We strongly believe that we have the right strategy and right team to successfully launch plecanatide and address the unmet needs of a growing GI market."

50.   On March 1, 2017, the Company issued a press release summarizing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2016.  In its press release the Company again emphasized that TRULANCE was a differentiated therapeutic option for patients with CIC.  The press release stated:

> The approval of TRULANCE™ (plecanatide) in the United States for the treatment of adults with chronic idiopathic constipation was a tremendous event not just for Synergy, but also *for the millions of patients with CIC who have been in need of a new therapeutic option.*

51.   On March 21, 2017, Synergy executives participated in a conference call at the Oppenheimer Healthcare Conference.   On the conference call, defendant Garcia touted TRULANCE's apparent edge over its competition, representing that patients with CIC using TRULANCE would no longer have to suffer "the side effects they might suffer from some of the treatments they[] [were] on in the past."   According to defendant Garcia, TRULANCE

"provide[d] the promise of being able to make patients feel like they are normal." During the conference call, defendant Garcia stated:

> And just to emphasize a little bit on the efficacy, as you can see in this slide, whether you look at the first CIC trial or the second CIC trial, whether you look at the graphs above with complete spontaneous bowel movements or the graphs on the bottom, spontaneous bowel movements, the efficacy was rapid within the first week immediately, and sustained throughout the trial. And the moment the drug is stopped, you can see how the patients came right back down to [where] our placebo is.

> So very strong efficacy, clearly this is what patients are looking for. But it's not just about increasing bowel movements. Having unlimited bowel movements is not what patients are really looking for in terms of normal. ***What they are looking for is, of course, increased bowel movements, but also normal stool consistency, what they don't want is to be cycling constantly between the constipated hard stools, the painful hard stools or the diarrhea, the side effects they might suffer from some of the treatments they've been on in the past.***

> \* \* \*

> So, we've talked a little bit about the market. We've talked a little bit about the product, now let's talk about the strategy. I am very excited to share this – and you can go to our website and see more of it, but it is incredibly powerful creative campaign based on a lot of marketing insights from a lot of marketing research, and we are really pleased. This is the kind of campaign marketers dream of because you usually have trouble finding a campaign that works both for healthcare providers as well as patients, that really scores very well and we're off the charts.

> This campaign scored off the charts for both groups. So it's been a consistent in terms of the messaging, images and creative campaign aimed at both groups, at the patients and the healthcare providers, pharmacists, physicians, etc. And the whole point is that with chronic constipation, the trade-offs that patients have had to make, ***the extremes they've had to go from constipation or to diarrhea because of some of the medications they may have been on in the past, that they no longer have to make that trade-off***. ***That TRULANCE provides the promise of being able to make patients feel like they are normal, right smack in the middle between the extremes.***

> \* \* \*

> Our goal is to ensure patients and physicians try TRULANCE, get experience with it. ***We are confident that once they get that experience and they are able to contrast it not just to our clinical trial data, but to the experience they've had***

*with other therapies, that that will encourage further trial and further usage
with their patients.*

52. During Synergy's May 3, 2017 conference call as part of the Deutsche Bank

Health Care Conference, defendant Jacob continued to tout the efficacy and superiority of

TRULANCE. In a discussion with an analyst, defendant Jacob stated:

> [Analyst]: *What arguments do your representatives use to convince leading
> health care providers to switch from linaclotide [Linzess] to plecanatide
> [TRULANCE]*? And conversely, what arguments do Ironwood reps use to keep
> those leading HCPs prescribing linaclotide? And I have a couple more.

> [Defendant Jacob]: Thanks for the question. We're not going to obviously, dive
> into our message platform for competitive reasons, but as we both discussed and
> as I talked about when – with the one slide that looked at our profile and ingrained
> in kind of what we get from the label. Our discussions are based on
> pharmacology, the efficacy, the safety/tolerability and the dosing, the balance of
> that approach. And you probably see that in some of the other materials that we
> have in our campaign right now. So that's kind of what we're talking to. *I can't
> really talk to the competition. I do know obviously they've been out there for
> long period of time and have had kind of a standard approach. But for us, we're
> focused on that balance between the pharmacology, the reason I believe, the
> efficacy, safety/tolerability and the dosing.*

> [Analyst]: Okay. On the adverse events, did you define—I know the competitor
> much better than I know your company. Did you define adverse events in your
> Phase III studies the same way that they did?

> [Defendant Jacob]: *So look, I think it's important to recognize that we—in the
> summary basis of approval, FDA indicated that they saw no issues with how we
> recorded, how we coded and how we categorized adverse events*. And of course,
> the label speaks for itself.

53. On August 9, 2017, Synergy issued a press release summarizing the Company's

financial and operating results for the second quarter of 2017. The press release commented on

the launch of TRULANCE and highlighted the "strong initial demand for TRULANCE," that

"reinforce[ed] the need for new treatment options for patients suffering from CIC." The press

release stated:

> "The first half of 2017 was a truly transformative period for Synergy, as we
> transitioned into a commercial organization and launched our first product,

- 23 -

TRULANCE, in the U.S. for the treatment of adults with chronic idiopathic constipation (CIC)," said Gary S. Jacob, Ph.D., Chairman and CEO of Synergy Pharmaceuticals Inc. "*We are pleased with the execution of our commercial strategy, and the strong initial demand for TRULANCE, reinforcing the need for new treatment options for patients suffering from CIC.* And we are making significant progress in ensuring broad access to TRULANCE, highlighted by a number of favorable early decisions from key national players."

54.     On September 27, 2017, Synergy participated in a conference call as part of the Cantor Fitzgerald Global Healthcare Conference.  During the conference call, defendant Garcia continued to tout TRULANCE's purportedly superior side-effect profile to its competitors, explaining that TRULANCE is a "very, very safe and well-tolerated product."  As a result of TRULANCE's apparent superiority, defendant Garcia represented that Synergy had a unique opportunity to grow the market for CIC treatments.  On the call, defendant Garcia stated:

Of course, right now, we are focused on CIC, that's what we're approved for and that's someone in the 30 million to 33 million number of adults. So, it's a very large market out there. *But what's most compelling or significant here is that when you look at that entire market, and this is looking at CIC and IBS-C together, what you see is that for the branded prescriptions, the Linzess, the AMITIZA, the Trulance, less than 5% of the U.S. adults are being treated with these branded prescriptions. There is a huge significant opportunity here to grow that.* And imagine that if we just – that's less than 1 in 20 patients are getting a prescription. What if that were 1 in 10 or even 1 in 5 in the future. That could easily double, quadruple the size of this market and the opportunity for the branded prescriptions.

And we think the market will continue to grow because you have things like the increasing awareness of gut health and how it effects overall well-being. *You have the continued promotion both from a healthcare professional as well as disease awareness from key competitors, and of course, the availability of new treatments like Trulance, which we think is significant and will continue to grow this market and motivate patients to go see their physicians about their condition.*

So, we are very confident we're in the right market. But, of course, it's making sure that you have the right product that helps address the unmet needs in the market. And I'll go to slide 10 here. These are the four pillars, if you like, of what gives us the confidence that we have the right product.

First off, in terms of our pharmacology. Trulance is the only product that's thought to replicate the pH-sensitive activity of uroguanylin. Uroguanylin is a

- 24 -

natural peptide that every single one of us excrete in response to food. And it is what helps, for those of us who are lucky enough not to suffer from one of these two conditions, maintain a healthy gut activity and a gut system. So, this is something that's very unique about Trulance and there is no other product that has that characteristic. ***In terms of efficacy, it's unsurpassed. Early efficacy, quick efficacy and sustained as we saw in the CIC trials. The safety and tolerability, I mean, that was a huge win when we saw the Phase 3 trials.***

***And when you look at the label, there's only one side effect listed, that's above 2% more than placebo and that's diarrhea at 5%. So, a very, very safe and well-tolerated product***. And in terms of dosing, and I do want to talk a little bit about dosing, which I sometimes feel doesn't get enough play. As we can see here on the next slide, this is the only branded prescription treatment for CIC that can claim that it's not just once a day, but the patient can take it any time. And they can take it with or without food. It really empowers the patient to decide for themselves. When do I want to fit this medication into my lifestyle as opposed to them having to adjust their lifestyle to whatever restrictions there may be in terms of dosing and administration for the therapy.

55.     During the same call, defendant Garcia explained that TRULANCE provided "a treatment option that was not just easy to use … and well-tolerated" but that also "address[ed] some of the [patient's] unmet needs."  Defendant Garcia also highlighted TRULANCE's "very positive early launch results."  Defendant Garcia stated:

***And that's exactly what we set out to do, is provide a treatment option that was not just easy to use and efficacious and well-tolerated but that address some of the unmet needs.*** And from physicians, they just wanted something that was easy and would not provide any – or cause the patient to have to call back and have to continue to adjust doses or anything like that. And for patients, of course, as I mentioned, something that was easy to use and efficacious. And so far, the feedback has been very, very positive anecdotally.

So, just to summarize, again, our focus, we – very positive early launch results. We're feeling really good about the track run with Trulance and early prescriber and patient experience appears very promising, as I mentioned earlier. We're going to continue to execute on our launch plan. Of course, we're always making adjustments as we learn, as you engage in the marketplace. But our launch plan seems to have been spot on in terms of what we had hoped to achieve.  And then, of course, looking forward, we're looking to broaden the base or expand the utility for Trulance.

56.     The statements set forth in ¶¶49-55 were improper because they misleadingly represented that TRULANCE's side-effect profile was superior to its competitors, when in fact

TRULANCE's side-effect profile is no better than its competitors, especially with respect to diarrhea, the drug's most common side effect.

**<u>Improper Statements Concerning the CRG Loan</u>**

57.    On September 5, 2017, Synergy filed a Current Report on Form 8-K with the SEC disclosing that the Company had closed on a $300 million debt financing structured as senior secured loans from CRG.  Under the terms of the financing, Synergy was entitled to $100 million of upfront funding upon the execution of the loan documents.  The Form 8-K disclosed that the remaining $200 million was subject to the satisfaction of certain "borrowing conditions," while concealing from investors the nature of these conditions, stating:

> The Loan Agreement provides for a $300.0 million term loan facility to the Company, $100.0 million of which was borrowed at closing (the "Initial Term Loan"). The Loan Agreement provides for future borrowings, subject to the satisfaction of certain financial and revenue milestones and other borrowing conditions as follows: (i) an additional $100.0 million on or before February 28, 2018 (the "Second Tranche Term Loan"), and (ii) up to two additional tranches of up to $50.0 million each on or before March 29, 2019 (together with the Initial Term Loan and the Second Tranche Term Loan, the "Term Loans").

58.    Later that day, September 5, 2017, the Company issued a press release entitled "Synergy Pharmaceuticals Secures $300 Million Debt Financing."  The Company's press release reiterated that the Company had closed on a $300 million debt financing and explained the motivation for the financing.  According to the Company's press release, the financing would provide Synergy with the "financial flexibility to … execute on the launch of TRULANCE" and support the Company's "commercialization of TRULANCE."  The Company's press release emphasized that the financing was "non-dilutive."  These statements assured investors that the CRG Loan would fund Synergy's "plans for the Company through 2019," and therefore removed any short or near term funding needs.  The press release stated:

> NEW YORK—(BUSINESS WIRE)—Synergy Pharmaceuticals Inc. (NASDAQ: SGYP), announced today that the Company has closed on a $300 million debt

financing structured as senior secured loans from CRG LP, a healthcare focused investment firm, and its lender syndicate.

*"This non-dilutive financing enhances our cash position and provides us with financial flexibility to continue to execute on the launch of TRULANCE and achieve our business objectives, which we are confident will ultimately maximize long-term shareholder value," said Gary Gemignani, EVP and Chief Financial Officer of Synergy Pharmaceuticals Inc. "The structure of this financing provides us with access to capital for support of our commercialization of TRULANCE and funds our current plans for the Company through 2019 when, based on our current assumptions, we expect to be cash flow breakeven."*

59.     On September 7, 2017, the Company hosted its Business Update Call with investors and analysts to discuss its results for the second quarter of 2017.  On the conference call, defendant Jacob repeated the Company's prior statements about the $300 million debt financing and reiterated that the financing was to provide the Company with the "financial flexibility to continue to execute on the launch of TRULANCE."  Defendant Jacob further assured investors that this $300 million debt financing removed any short-term funding needs, stating that the debt financing would "provide[] access to additional capital if and when [Synergy] need[s] it."  Defendant Jacob stated:

And on Tuesday this week, we announced that we secured a debt financing that provides us with access of up to $300 million in additional capital. *This financing strengthens our cash position and provides us with financial flexibility to continue to execute on the launch of TRULANCE and achieve our key business priorities, which we are confident will ultimately maximize shareholder value.*

*     *     *

*The debt financing that we just announced on Tuesday provides access to additional capital if and when we need it, and gives us the greatest flexibility to execute on our corporate strategy*. In conjunction with this financing, we are continuing to evaluate opportunities to improve expense management with the goal of transitioning the company to cash flow positive.

60.     During the same call, defendant Gemignani further explained the structure of the deal.  Defendant Gemignani explained that the first tranche of $100 million was funded upon the

execution of the loan documents.  With respect to the remaining $200 million, defendant Gemignani explained that Synergy had access to an additional $100 million "on or before February 28, 2018, and up to two additional tranches of up to $50 million each on or before March 29, 2019," but obfuscated around the onerous performance milestones conditioning these additional tranches.  With respect to the additional tranches, defendant Gemignani vaguely stated that future tranches were "subject to the satisfaction of certain financial and revenue milestones and other borrowing conditions."  Defendant Gemignani stated:

> Turning to slide 9. As Gary just mentioned, we achieved an important milestone this week when we announced that the company secured up to $300 million in the debt financing structured as a senior secured loan from CRG, a health care-focused investment firm. *This non-dilutive financing enhances our cash position and provides us with financial flexibility to continue to execute on the launch of TRULANCE and achieve our business objectives, which Gary just outlined for you.*
>
> *The structure of the deal provides us with access to additional capital if and when we need it*, to support the product launch and to take the company through 2019 when based on our current assumptions we expect Synergy to be cash flow breakeven. The first tranche of $100 million was funded upon the execution of the loan documents. *Under the terms of the agreement, we have access to an additional $100 million on or before February 28, 2018 and up to two additional tranches of up to $50 million each on or before March 29, 2019, subject to the satisfaction of certain financial and revenue milestones and other borrowing conditions.*

61.     While concealing the nature of the performance goals conditioning the second $100 million tranche, defendant Gemignani assured investors that the Company could easily meet these undisclosed "performance milestones," and therefore the CRG debt financing was sufficient to launch TRULANCE and cover any short-term funding needs.  Through these representations, defendant Gemignani led the investing public to believe that Synergy could successfully develop and profit from TRULANCE without raising additional capital and without diluting stockholders' equity interests.  Defendant Gemignani stated:

While we are not providing revenue or cash burn guidance at this stage, *we are confident in our ability to meet all of the performance milestones stated under the terms of this agreement, and we will have access to additional capital if and when we need it*. Going into the second half of 2017, we expect our operating cash burn to be in line with the first half of this year. As we move into 2018, we expect R&D expenses to decrease primarily due to the wind-down of our IBS-C development program. Additionally, we have no plans to initiate any new clinical development or early discovery research programs in 2018.

Looking at SG&A. We're evaluating opportunities to improve cost efficiency measures, and we'll continue to focus investments in key commercial activities that continue to drive TRULANCE demand and ensure long-term success of the franchise and ultimately drive profitability. We are currently evaluating the 2018 business plans, and we'll provide expense guidance in future periods. In TRULANCE, we have a high-value asset and a large and growing market, supported by a strong and highly experienced commercial team.

*With the capital from this financing and continued success of the launch, we are confident we are well positioned to effectively maximize the value of TRULANCE and add significant value to the company and its shareholders.*

62.     Following these statements, Timothy Chiang ("Chiang"), an analyst at BTIG, asked defendant Gemignani to expand on the Company's level of confidence in hitting the performance milestones conditioning CRG's subsequent tranches.  The following exchange took place between Chiang and defendant Gemignani:

[Chiang]: And just maybe one follow-up for Gary [Gemignani]. In terms of the CRG deal, I noticed that it is somewhat of a tiered deal in terms of the timing of the debt or the cash that you received. And I just wanted to circle back and ask you how confident are you that you'll hit the milestones or the financial targets that CRG has set for you.

[Defendant Gemignani]: Hi, Tim. Thanks. Look, we're very confident. In fact, the way we structured this deal, we looked at numerous types of structures and with the goal of getting the right size, the lowest cost to capital and structure in a way where our debt service would be as low as possible in the earlier years so that we could put the cash to work on funding our commercial launch. *So we're—again, we've had the CRG obviously with extreme amounts of diligence and we are—as we constructed the tiers, we're very comfortable we'll be able to meet all of the commitments.*

63.     On November 9, 2017, Synergy held an earnings call with investors and analysts to discuss the Company's results for the third quarter ended September 30, 2017.  During the call,

the Company's executives continued to obfuscate around the requirements conditioning the second tranche while assuring investors of Synergy's ability to meet these undisclosed "conditions" and access the additional capital. Defendant Gemignani stated:

> The deal structure allows us to pay interest only on quarterly basis for the first five years, and we can elect to pick a portion of that interest for the first several quarters. This gives us flexibility to focus spend on the launch period and driving demand and growing revenue. This structure also provides us with access to multiple tranches of up to an additional $200 million in non-dilutive capital should we choose to draw upon it.

> Under the terms of the agreement, we have access to an additional $100 million on or before February 28, 2018, and up to two additional tranches of up to $50 million on or before March 29, 2019, subject to certain conditions.

> ***While I cannot comment on the specific conditions required to access the additional tranches beyond what's publically disclosed, I can tell you that we are confident in our ability to meet the conditions that will allow us to access to the additional capital if and when we need it.***

64. The above statements were improper because they failed to disclose that: (i) CRG conditioned the second $100 million tranche on Synergy having at least $128 million in cash or cash equivalents on hand by January 31, 2018; (ii) that the Company would be unable to meet these undisclosed loan agreement conditions without issuing additional dilutive equity because of the dramatic slowdown in TRULANCE prescriptions; (iii) the CRG debt financing was therefore insufficient to "execute on the launch of TRULANCE" and fund Synergy's operations through 2019; and (iv) the CRG Loan was not "non-dilutive," because Synergy could not access the second tranche of the loan without issuing additional dilutive equity to meet the cash balance requirements conditioning the second tranche.

## Defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman Negligently Make Misleading Statements in Synergy's 2017 Proxy

65. On April 28, 2017, Synergy issued its 2017 Proxy for the 2017 Annual Meeting of Stockholders, held on June 27, 2017. In the 2017 Proxy, defendants Adams, Brancaccio,

Callahan, Daly, Jacob, Joslyn, and Spigelman solicited stockholder votes to, among other things: (i) reelect themselves to the Board; (ii) amend Synergy's Certificate of Incorporation to increase the number of shares of common stock authorized for issuance from 350 million to 400 million; and (iii) approve Synergy's 2017 Equity Incentive Plan ("Equity Plan").  Defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman negligently issued misleading statements with respect to each of these solicited votes.

66.     Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**Misstatements in Support of Reelecting Defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman**

67.     In the 2017 Proxy, defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman solicited votes to reelect themselves to the Board.  In support of their bid to reelect themselves, these defendants highlighted their supposed successful oversight of the Company.  In particular, the 2017 Proxy described their responsibilities and the duties of each committee, incorrectly claiming that: (i) the Board was engaged in active risk oversight of the Company; (ii) the Audit Committee exercised oversight of the Company's financial statements; and (iii) the Compliance Committee ensured the Company's compliance with applicable laws, regulations, and requirements.  With respect to the responsibilities of the Board, the 2017 Proxy stated:

**Board Responsibilities and Structure**

The Board oversees, counsels and directs management in the long-term interest of Synergy and its stockholders. The Board's responsibilities include establishing broad corporate policies and reviewing the overall performance of Synergy. The Board is not, however, involved in the operating details on a day-to-day basis.

\* \* \*

**Board Leadership Structure and Role in Risk Oversight**

From July 2008 until September 30, 2013, we separated the roles of Chairman of the Board and Chief Executive Officer. Although the separation of roles was appropriate for us during that period of time, in the view of the board of directors, the rationale for the separation of these roles depended upon the specific circumstances and dynamics of our leadership at that point in time.

The board of directors, as a unified body and through committee participation, organizes the execution of its monitoring and oversight roles and does not expect its Chairman to organize those functions. The board of directors has four standing committees—Audit, Compensation, Corporate Governance/Nominating and External Communication Oversight. The membership of each of the board committees is comprised of independent directors, with each of the committees having a separate chairman, each of whom is an independent director. Our non-management members of the board of directors meet in executive session at each board meeting.

Risk is inherent with every business, and how well a business manages risk can ultimately determine its success. Management is responsible for the day-to-day management of risks the company faces, while the board of directors, as a whole and through its committees, has responsibility for the oversight of risk management. In its risk oversight role, the board of directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed.

The board of directors believes that establishing the right "tone at the top" and that full and open communication between executive management and the board of directors are essential for effective risk management and oversight. Our CEO communicates frequently with members of the board to discuss strategy and challenges facing the company. Senior management usually attends our regular quarterly board meetings and is available to address any questions or concerns raised by the board of directors on risk management-related and any other matters. Each quarter, the board of directors receives presentations from senior management on matters involving our areas of operations.

68.     With respect to the key oversight responsibilities of the Board's Audit Committee

and Compliance Committee, the 2017 Proxy stated:

**Audit Committee**

We have a separately-designated standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. The Audit Committee's responsibilities include: (i) reviewing the independence, qualifications, services, fees, and performance of the independent registered public accountants, (ii) appointing, replacing and discharging the independent auditors, (iii) pre-approving the professional services provided by the independent auditors, (iv) reviewing the scope of the annual audit and reports and recommendations submitted by the independent auditors, and (v) reviewing our financial reporting and accounting policies, including any significant changes, with management and the independent auditors. The Audit Committee also prepares the Audit Committee report that is required pursuant to the rules of the SEC.

*   *   *

**Compliance Committee**

The Compliance Committee has responsibility for providing oversight to the Board and Company management on the development and implementation of a robust and effective compliance program, and for ensuring the Company's compliance with applicable laws, regulations and requirements.

69.     Through these statements, defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, disclosure review, and reporting programs to identify and address wrongdoing; (ii) was well informed of the Company's financial condition through myriad information channels; and (iii) promoted prudent risk management practices.  In reality, the Board, Audit Committee, and Compliance Committee did not exercise active and appropriate oversight over the Company's corporate governance, risk management, and financial statements. Defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman were negligent in including these misleading statements in the 2017 Proxy.

70.     The 2017 Proxy harmed Synergy by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the misleading statements in the 2017 Proxy, Synergy's stockholders voted via an

uninformed stockholder vote to reelect defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman to Synergy's Board.

### Misstatements in Support of Vote to Approve an Amendment to Synergy's Certificate of Incorporation to Increase the Authorized Shares of Common Stock and Vote to Approve Synergy's Equity Plan to Increase the Number of Shares Available Under the Plan

71.     Defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman also negligently made misrepresentations in the 2017 Proxy in support of stockholder votes for approval of: (i) an amendment of the Certificate of Incorporation to increase the number of common shares available for issuance; and (ii) Synergy's Equity Plan to consolidate and replace all of Synergy's then outstanding equity incentive plans and increase the number of shares available for issuance.

72.     The amendment of the Certificate of Incorporation sought to increase the total number of shares of common stock that can be issued by fifty million, from 350 million to 400 million, with dilutive effects.  The increase in the number of authorized shares would allow the Company to issue shares under the proposed Equity Plan.  In support of the requested approval, the 2017 Proxy stated:

> The increase in the number of authorized but unissued shares of common stock would enable us, without further stockholder approval, to issue shares from time to time as may be required for other proper business purposes, such as raising additional capital for ongoing operations, business and asset acquisitions, stock splits and dividends, ***present and future employee benefit programs (including under the proposed Synergy Pharmaceuticals Inc. 2017 Equity Incentive Plan) and other corporate purposes.***

73.     The Equity Plan sought to consolidate and replace all of Synergy's then outstanding equity incentive plans and increase the total number of shares that can be issued under the plan by nine million, from 4.2 million to 13.2 million, with dilutive effects.  In support

of the requested approval, the 2017 Proxy explained that the purpose of the Equity Plan was to

"attract and retain key personnel."  The 2017 Proxy stated:

> *The purpose of the Plan is to attract and retain key personnel and to provide a means for directors, officers, managers, employees, consultants and advisors to acquire and maintain an interest in the Company, which interest may be measured by reference to the value of its common stock.*
>
> Grants of stock options to our named executive officers and our directors are made from our 2008 Equity Compensation Incentive Plan—referred to in this Proposal as the 2008 Plan.  In July 2018, the 2008 Plan will expire and we will not be able to issue equity to our named executive officers or our directors unless our stockholders approve a new stock plan. *While we could increase cash compensation if we are unable to grant equity incentives, we anticipate that we will have difficulty attracting, retaining, and motivating our named executive officers and our directors if we are unable to make equity grants to them.* Stock options are a more effective executive compensation vehicle than cash at a growth-oriented, entrepreneurial company because they deliver high potential value with a smaller impact on current income and cash flow. Therefore, we are asking our stockholders to approve the Plan.

74.     As discussed above, in the 2017 Proxy, defendants Adams, Brancaccio, Callahan,

Daly, Jacob, Joslyn, and Spigelman emphasized their apparent successful oversight of the

Company.  In particular, these defendants improperly claimed that: (i) the Board was engaged in

active risk oversight; (ii) the Audit Committee exercised oversight of the Company's financial

statements; and (iii) the Compliance Committee assured Synergy's compliance with applicable

laws, regulations, and requirements.  Through these representations, Synergy's stockholders were

led to believe the Company's directors and officers were adequately and effectively carrying out

their duties, and therefore it was beneficial to the Company's long-term success to retain and

motivate these "key personnel" through equity incentives.

75.     In reality, the defendants were completely failing in their duties to exercise

reasonable and prudent supervision over the management, policies, practices, and controls of the

financial affairs of the Company.   Specifically, the Board failed to maintain sufficient

compliance, internal control, disclosure review, and reporting programs to apprise the Board of

significant risks; (ii) the Company lacked effective internal control over its financial reporting; and (iii) as a result, the Individual Defendants routinely misrepresented the Company's business, operations, and compliance policies.  Consequently, it was not in Synergy's best interests to retain and motivate these supposedly "key personnel" through equity incentives.

76.     As a result of the misleading statements in the 2017 Proxy, Synergy's stockholders voted for the increase in shares available for distribution under Synergy's Certificate of Incorporation and the Equity Plan.  This vote was made without the benefit of material information regarding the defendants' continued and ongoing failure to adequately and appropriately carry out their obligations as directors and officers of Synergy.  For these reasons, the above statements in the 2017 Proxy were materially misleading and caused stockholders to vote for the increase in shares for distribution under the amendment and the Equity Plan without adequate information necessary to make a reasonably informed decision.

## THE TRUTH EMERGES

77.     The truth about TRULANCE's side-effect profile in comparison to its competitors emerged on November 9, 2017, after the market closed, when Synergy filed with the SEC its Quarterly Report on Form 10-Q announcing its financial results for the third quarter ended September 30, 2017.  The Company also released a slide show presentation detailing Synergy's "Key Performance Metrics" (the "Presentation").  The Presentation revealed a dramatic slowdown in TRULANCE prescriptions.  Specifically, while the average month-over-month growth rate in TRULANCE prescriptions was over 116% per month from April 2017 through August 2017, in September 2017, TRULANCE prescriptions grew only 4.4%.  The Presentation further revealed that September 2017 was the fourth consecutive month in which the number of TRULANCE prescriptions written by each individual TRULANCE prescriber had decreased.

78.     Attached to the Form 10-Q as an exhibit was the agreement underlying the CRG Loan (the "Term Loan Agreement").   The Term Loan Agreement revealed the onerous undisclosed terms conditioning Synergy's ability to obtain the additional tranches.  Specifically, CRG conditioned the second $100 million tranche on Synergy having at least $128 million in cash or cash equivalents on hand by January 31, 2018.  The Term Loan Agreement defined the "Second Tranche Borrowing Milestone" as:

> "***Second Tranche Borrowing Milestone***" means that, as of January 31, 2018, ***Borrower shall have an amount of cash and Permitted Cash Equivalent Investments (which for greater certainty shall not include availability under any undrawn credit lines) equal to or greater than $128,000,000*** that (i) is held in one or more accounts over which the Secured Parties have a perfected security interest, (ii) is otherwise unencumbered (other than pursuant to a Loan Document), (iii) consists of funds from operations or other sources of financing that do not include any proceeds of borrowings from any third party incurred after the date hereof (other than the Lenders under this Agreement), and (iv) does not comprise funds that, as of the date of the notice delivered pursuant to this definition, must be applied (x) pursuant to **Section 3.03(b)** to repay any Obligations or (y) pursuant to any agreement governing Permitted Priority Debt to repay any Permitted Priority Debt; *provided that* Borrower shall have delivered to Administrative Agent a notice certifying satisfaction of the foregoing condition no later than ten (10) days thereafter, together with supporting documentation provided by Borrower (*provided that* Administrative Agent shall have the right to request and obtain information reasonably related to determining satisfaction of the foregoing condition, including information regarding Borrower's expenses, sources of cash, and other relevant calculations), reasonably satisfactory to Administrative Agent, which documentation shall in any event include a certificate of a Responsible Officer confirming that since the date hereof, there has been no material adverse deviation in Borrower's payment of expenses, as they arise in the ordinary course of business (including continued payment of accounts payable and accrued expenses within 60 days from the date payable on average), and that Borrower is operating without a material adverse deviation from the Approved Projections.

79.     Then, on November 13, 2017, Synergy shocked the market when it filed with the SEC a Registration Statement on Form S-3 and issued a press release announcing a share offering to help "fund its commercialization activities related to TRULANCE."  Given that only a few days earlier, on November 9, 2017, Synergy had assured investors that the nondilutive

CRG debt financing removed any short-term funding needs, this revelation shocked analysts who described this dilutive capital increase as "unexpected" and "blindsiding."  This shock is further reflected in the more than $111 million market capitalization loss over the following two trading days.

80.    On the following day, November 14, 2017, Synergy filed with the SEC its Prospectus on Form 424B5 to the previous day's Registration Statement, announcing the competition of a secondary offering of approximately twenty-two million Synergy shares at $2.58 per share, with warrants to purchase another approximately twenty-two million shares in the future at $2.86 per share, for gross proceeds of roughly $56 million.  This offering diluted stockholders' equity interests by approximately 10%.

81.    Following these disclosures, Synergy's stock price fell more than 30%, from a close of $2.72 per share on November 10, 2017, to close at $1.89 on November 15, 2017, erasing nearly $150 million in market capitalization.  In addition, after the truth about TRULANCE's side-effect profile and Synergy's inability to meet the conditions of the CRG Loan without a dilutive share offering hit the market, certain investors filed the Securities Class Actions against Synergy.

82.    In the wake of these disclosures analysts have questioned Synergy's decision to conceal the onerous terms of the CRG Loan from investors.  For instance, in a November 14, 2017 article published by *Seeking Alpha*, one analyst opined that defendant Gemignani's vague statements concerning the terms of the loan "looks a lot like obfuscation … bordering on deliberate misdirection."  The article also notes a loss of confidence in Synergy's management: "Can we trust Synergy management?…  The question is especially pertinent given the company's

claims after its last secondary offering, in January, that it would not do it again.  For those

holding for the longer-term capital appreciation, the specter of dilution will be omnipresent."

## DAMAGES TO SYNERGY

83.     As a result of the Individual Defendants' improprieties, Synergy disseminated

improper, public statements concerning TRULANCE's side-effect profile in comparison to its

competitors and the sufficiency of the CRG Loan to meet the Company's financial needs such

that Synergy would not need to conduct a stock offering through at least 2019.  These improper

statements have devastated Synergy's credibility as reflected by the Company's staggering

multimillion-dollar market capitalization loss as the truth was revealed to the public.

84.     The Individual Defendants' improper course of conduct has also subjected the

Company to potentially more than a hundred million dollars in damages in connection with the

Securities Class Actions filed in the U.S. District Court for the Eastern District of New York.

The Securities Class Actions allege that the Company and certain Individual Defendants,

including defendants Garcia, Gemignani, Hamilton, and Jacob, violated federal securities laws

by repeatedly misrepresenting that TRULANCE has a superior side-effect profile to its

competitors and that the CRG Loan would fund the launch of TRULANCE without diluting

Synergy's stockholders.

85.     Synergy's misleading statements also severely damaged its reputation within the

business community and in the capital markets.  In addition to price, Synergy's current and

potential investors consider a company's trustworthiness, stability, and ability to evaluate known

risks.  Investors are less likely to invest in companies that disseminate improper statements, fail

to comply with their own internal protocols and external regulations, and are uncertain about

their own financial condition.   Accordingly, Synergy's ability to attract investors is now

impaired.  In addition, Synergy's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

86.     Further, as a direct and proximate result of the Individual Defendants' actions, Synergy has expended and will continue to expend significant sums of money.   Such expenditures include, but are not limited to:

(a)     costs incurred in defending and paying any settlements in the Securities Class Actions for violations of federal securities laws;

(b)     costs incurred to investigate wrongdoing; and

(c)     costs incurred from the substantial compensation and benefits paid to the defendants who have breached their duties to Synergy.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.     Plaintiff brings this action derivatively in the right and for the benefit of Synergy to redress injuries suffered, and to be suffered, by Synergy as a direct result of violations of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Synergy is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

88.     Plaintiff will adequately and fairly represent the interests of Synergy and its stockholders in enforcing and prosecuting Synergy's rights.

89.     Plaintiff is a Synergy stockholder, was a stockholder of Synergy at the time of the wrongdoing complained, and has continuously been a stockholder of Synergy.

90.     The current Board of Synergy consists of the following eight individuals: defendants Adams, Brancaccio, Callahan, Daly, Hamilton, Jacob, Joslyn, and Spigelman.

91.     Plaintiff has not made any demand on the Board to bring the allegations herein because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

92.     The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants Adams, Brancaccio, Callahan, Daly, Hamilton, Jacob, Joslyn, and Spigelman face a substantial likelihood of liability for repeatedly failing to comply with this duty.

93.     As alleged above, a majority of the current Board members, including Director Defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman, violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2017 Proxy.  Defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman are responsible for the negligently made statements in the materially misleading 2017 Proxy.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  Accordingly, an indemnification provided by the Company to defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman does not protect them for violations of section 14(a) in the 2017 Proxy.  As a result, defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman face a substantial likelihood of liability, excusing a demand.

94.     In addition, as alleged above, all of the current Board members, including Director Defendants Adams, Brancaccio, Callahan, Daly, Hamilton, Jacob, Joslyn, and Spigelman breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding:  (i) TRULANCE's side-effect profile in

comparison to its competitors; and (ii) the sufficiency of the CRG Loan to fund the launch of TRULANCE without diluting Synergy's stockholders.  In making these improper and misleading statements, defendants Adams, Brancaccio, Callahan, Daly, Hamilton, Jacob, Joslyn, and Spigelman breached their fiduciary duties.  Accordingly, all the members of the Board face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

95.     Defendants Brancaccio, Callahan, and Spigelman, as members of the Audit Committee, reviewed and approved the improper statements.  The Audit Committee's Charter provides that the members must oversee the Company's "financial reporting processes and audits of its financial statements"  Moreover, the Audit Committee's Charter provides that the Audit Committee members are responsible for providing assistance to the Board with respect to oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the performance of the Company's internal audit function and independent auditor.  Furthermore, the Audit Committee Defendants reviewed and approved the improper press releases and SEC filings made to the investing public.  Thus, defendants Brancaccio, Callahan, and Spigelman were responsible for knowingly or recklessly allowing the improper statements.  Accordingly, defendants Brancaccio, Callahan, and Spigelman face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

96.     The acts complained of herein constitute violations of the fiduciary duties owed by Synergy's officers and directors and are incapable of ratification.

**Demand Is Excused as to Defendant Hamilton Because He Lacks Independence**

97.     Defendant Hamilton has been CEO of Synergy since December 31, 2017.  Prior to becoming Synergy's CEO, Hamilton served as the Company's Chief Commercial Officer.

Defendant Hamilton is not an independent director because defendant Hamilton's principal professional occupation is his employment with Synergy, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.  In addition, defendant Hamilton's reputation is inextricably linked to his role at Synergy. Accordingly, defendant Hamilton lacks independence from defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman due to his interest in maintaining his executive position at Synergy.  Synergy paid defendant Hamilton the following compensation:

| Year | Salary | Bonus | Option Awards | Total |
|------|--------|-------|---------------|-------|
| 2017 | $398,513 | $166,725 | $1,243,556 | $1,808,794 |
| 2016 | $390,000 | $177,500 | $527,682 | $1,095,182 |

Accordingly, defendant Hamilton is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Hamilton.

**Demand Is Excused as to Defendant Jacob Because He Lacks Independence**

98.     As a preliminary matter, Synergy has conceded in its SEC filings that defendant Jacob is not an independent director.  Specifically, in the Company's most recent Proxy Statement filed April 20, 2018, defendant Jacob is not listed as one of Synergy's allegedly independent directors.  Furthermore, until December 31, 2017, defendant Jacob's principal occupation was President, CEO, and Chairman of the Board.  Defendant Jacob is not an independent director because, until recently, defendant Jacob's principal professional occupation was his employment with Synergy, pursuant to which he received substantial monetary compensation and other benefits as alleged above.  In addition, defendant Jacob's reputation is inextricably linked to his role at Synergy.  Accordingly, defendant Jacob lacks independence

from defendants Adams, Brancaccio, Callahan, Daly, Hamilton, Joslyn, and Spigelman.  Synergy paid defendant Jacob the following compensation:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $556,200 | $562,034 | $2,851,899 | $31,542 | $4,001,675 |
| 2016 | $538,100 | $305,910 | $1,706,170 | - | $2,550,180 |

Accordingly, defendant Jacob is incapable of impartially considering a demand to commence and vigorously prosecute this action.  Demand is therefore futile as to defendant Jacob.

**Demand Is Excused as to Defendants Adams, Brancaccio, and Jacob Due to Their Overlapping Business Affiliations**

99.     Director Defendants Adams, Brancaccio, and Jacob are incapable of impartially considering a demand to commence and vigorously prosecute this action due to their long-standing overlapping business relationships.  Defendants Adams, Brancaccio, and Jacob have several entangling business relationships, all resulting from their continuing relationship with Synergy cofounder, Gabriele M. Cerrone ("Cerrone").  In particular:

(a)     ContraVir Pharmaceuticals, Inc. ("ContraVir") is a biopharmaceutical company focused on the development of antiviral drugs with a primary emphasis on the treatment of Hepatitis B virus infection.  In addition to serving on the board of directors together, defendant Jacob was CEO of ContraVir from May 2013 until March 2014, at which time he became, and continues to be, Chairman of ContraVir's board.  Likewise, defendant Brancaccio has been a director of ContraVir since May 2013, while defendant Adams has been a director of ContraVir since 2016.

(b)     Defendants Adams, Brancaccio, and Jacob all serve on the board of directors of Trovagene, Inc. ("Trovagene"), a clinical-stage, precision medicine oncology therapeutics company.  Defendant Jacob has been a director of Trovagene since February 2009,

defendant Brancaccio has been a director of Trovagene since December 2005, and defendant Adams has been the Chairman of Trovagene's board since April 2009.

(c)     Defendants Adams, Brancaccio, and Jacob all serve on the board of directors of Gensignia Life Sciences Inc. ("Gensignia"), a molecular diagnostics company dedicated to developing new techniques for the early detection of cancer.   Defendants Brancaccio and Adams have been directors of Gensignia since at least April 2015, and defendant Jacob has been the Chairman of Gensignia's board since at least April 2015.

(d)     Defendants Adams, Brancaccio, and Jacob served concurrently at Rasna Therapeutics, Inc. ("Rasna"), a company that develops therapeutics for leukemia and lymphoma. Defendant Jacob and Adams served on Rasna's Scientific Advisory Board from at least September 2016 until at least May 2017.   Further, defendant Brancaccio has served on Rasna's board of directors since August 2016.

(e)     Defendants Jacob and Adams have both served at Tiziana Life Sciences plc ("Tiziana"), a biotechnology company that focuses on the discovery and development of novel molecules that treat human disease in oncology and immunology.   Defendant Jacob served on Tiziana's Scientific Advisory Board from at least June 2016 until at least June 2017. Defendant Adams has served on Tiziana's Scientific Advisory Board since at least December 2017.

(f)     Defendant Jacob was employed by one of Synergy's predecessor companies, Synergy Pharmaceuticals, Inc. ("Synergy DE"), from 1999 to July 2008.   Defendant Jacob was Chairman of the board of directors of Synergy DE from October 2003 until July 2008, and Synergy DE's Chief Scientific Officer from 1999 until 2003.   In March 2003, Synergy DE was acquired by Callisto Pharmaceuticals, Inc. ("Callisto") and was a wholly owned subsidiary

of Callisto.  While serving as Chairman of the board of Synergy DE, defendant Jacob served concurrently on Callisto's board of directors from October 2004 until January 2013, and as Callisto's CEO and Chief Scientific Officer from May 2003 until January 2013.  Likewise, defendant Brancaccio served on Callisto's board from April 2004 until January 2013.

100.    Defendants Adams, Jacob, and Brancaccio's overlapping directorships at several companies raise a reason to doubt that they would sue each other.  Further, defendants Jacob and Brancaccio's relationship of working together for nearly fifteen years demonstrates that their close ties go beyond just a normal business relationship and raises a reason to doubt that they would sue each other.

101.    Defendants Adams, Brancaccio, and Jacob received the following compensation from their employment at the aforementioned companies:

| Adams, Thomas H. Compensation | | | | |
|---|---|---|---|---|
| Company | Fees Paid in Cash | Option Awards | Stock Awards | Total |
| ContraVir Pharmaceuticals, Inc. | $27,250 | $34,717 | - | $61,967 |
| Trovagene, Inc. | $417,666 | $498,349 | $166,220 | $1,082,235 |
| | | | TOTAL | $1,144,202 |

| Brancaccio, John P. Compensation | | | | |
|---|---|---|---|---|
| Company | Fees Paid in Cash | Option Awards | Stock Awards | Total |
| Callisto Pharmaceuticals, Inc. | $218,750 | $491,842 | - | $710,592 |
| ContraVir Pharmaceuticals, Inc. | $184,750 | $137,661 | - | $322,411 |
| Rasna Pharmaceuticals, Inc. | $25,000 | $128,952 | - | $153,952 |
| Trovagene, Inc. | $433,500 | $497,874 | $60,135 | $991,509 |
| | | | TOTAL | $2,178,464 |

| Jacob, Gary S. Compensation | | | | | |
|---|---|---|---|---|---|
| Company | Fees Paid in Cash | Bonus | Option Awards | Stock Awards | Total |
| Callisto Pharmaceuticals, Inc. | $2,400,492 | $879,796 | $13,933,326 | - | $17,213,614 |
| ContraVir Pharmaceuticals, Inc. | $142,789 | - | $783,356 | - | $926,145 |
| Trovagene, Inc. | $337,000 | - | $408,230 | $53,206 | $798,436 |
| | | | | TOTAL | $18,938,195 |

102.     There is a reasonable doubt that defendants Adams, Brancaccio, and Jacob would vote to initiate litigation against each other due to the sense of owingness each feel for the substantial rewards they reaped from Cerrone, the cofounder of Synergy, and because it would likely prevent defendants Adams, Brancaccio, and Jacob from being presented with future opportunities to serve on the boards of Cerrone's companies.  As a result of these long-standing and extensive professional entanglements, defendants Adams, Brancaccio, and Jacob are incapable of impartially considering a demand to commence and vigorously prosecute this action.  Demand is therefore futile as to defendants Adams, Brancaccio, and Jacob.

103.     Synergy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein.   Moreover, despite the Individual Defendants having knowledge of the claims and counts raised by plaintiff, the current Board has failed and refused to seek to recover for Synergy for any of the wrongdoing alleged by plaintiff herein.

104.     Plaintiff has not made any demand on the other stockholders of Synergy to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Synergy is a publicly held company with over 246 million shares outstanding and thousands of stockholders;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman for
Violation of Section 14(a) of the Exchange Act**

105.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

107.     Director Defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2017 Proxy.  In the 2017 Proxy, the Board solicited stockholder votes to reelect themselves to the Board, amend Synergy's Certificate of Incorporation to increase the number of shares of common stock available for issuance, and approve Synergy's Equity Plan.

108.     The 2017 Proxy, however, misrepresented that the Board: (i) maintained sufficient compliance, internal control, disclosure review, and reporting programs to identify and

address wrongdoing; (ii) was well informed of the Company's financial condition through myriad information channels; and (iii) promoted prudent risk management practices.  In reality, the Board, Audit Committee, and Compliance Committee did not exercise active and appropriate oversight over the Company's corporate governance, risk management, and financial statements. Defendants Adams, Brancaccio, Callahan, Daly, Jacob, Joslyn, and Spigelman were negligent in including these misleading statements in the 2017 Proxy.

109.    As discussed, these misleading statements were essential links in stockholders heeding Synergy's recommendation to reelect the current Board, amend Synergy's Certificate of Incorporation to increase the number of shares of common stock available for issuance, and approve Synergy's Equity Plan.   Accordingly, by reason of their misstatements, Director Defendants Adams, Brancaccio, Callahan, Daly, Hamilton, Jacob, Joslyn, and Spigelman violated section 14(a) of the Exchange Act.

110.    Plaintiff, on behalf of Synergy, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2017 Proxy in connection with the improper reelection of the members of the Board, approval of the amendment to Synergy's Certificate of Incorporation; and approval of Synergy's Equity Plan.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    As alleged in detail herein, the Individual Defendants by reason of their positions as officers and directors of Synergy and because of their ability to control the business and corporate affairs of Synergy, owed the Company fiduciary obligations of due care and loyalty,

and were and are required to use their utmost ability to control and manage Synergy in a fair, just, honest, and equitable manner.

113.    Each of the Individual Defendants violated their fiduciary duties by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

114.    The Officer Defendants were reckless, or were grossly negligent in disseminating the improper statements detailed herein.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) TRULANCE's side-effect profile was not superior to its competitors; (ii) the growth in TRULANCE prescriptions was declining; (iii) the Company would be unable to meet CRG's Term Loan Agreement conditions without issuing additional dilutive equity because of the dramatic slowdown in TRULANCE prescriptions; (iv) the CRG Loan was not "non-dilutive," because Synergy could not access the second tranche of the CRG Loan without issuing additional dilutive equity to meet the cash balance requirements conditioning the second tranche; and (v) the CRG debt financing was therefore insufficient to "execute on the launch of TRULANCE" and fund Synergy's operations through 2019.  As a result, the Officer Defendants' public statements about Synergy's business and financial status were misleading.  Accordingly, the Officer Defendants breached their duties of care and loyalty to the Company.

115.    Director Defendants, as directors of the Company, owed and owe Synergy the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly disseminating the improper statements detailed herein.  The Director Defendants either knew or were reckless in not knowing that: (i) TRULANCE's side-effect profile was not superior to its competitors; (ii) the growth in TRULANCE prescriptions was declining; (iii) the Company would be unable to meet CRG's Term Loan Agreement conditions without issuing additional

dilutive equity because of the dramatic slowdown in TRULANCE prescriptions; (iv) the CRG Loan was not "non-dilutive," because Synergy could not access the second tranche of the CRG loan without issuing additional dilutive equity to meet the cash balance requirements conditioning the second tranche; and (v) the CRG debt financing was therefore insufficient to "execute on the launch of TRULANCE" and fund Synergy's operations through 2019. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

116.     The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

117.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Synergy has sustained significant damages, as alleged herein.

118.     Plaintiff, on behalf of Synergy, has no adequate remedy at law.

## <u>COUNT III</u>

### Against the Individual Defendants for Waste of Corporate Assets

119.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.     As a result of the Individual Defendants' misleading statements, the Individual Defendants have caused Synergy to incur substantial costs.

121.     In addition, as a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Synergy is subject to

the Securities Class Actions.  The Individual Defendants have caused Synergy to waste its assets by forcing it to defend itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

122.    Further, the Individual Defendants have caused Synergy to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

123.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

124.    Plaintiff, on behalf of Synergy, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Synergy.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Synergy.

127.    Plaintiff, as a stockholder and representative of Synergy, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

128.    Plaintiff, on behalf of Synergy, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Synergy, demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Individual Defendants' violations of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Synergy to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Synergy and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and public;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

3.      a provision to permit the stockholders of Synergy to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Synergy has an effective remedy;

D.      Awarding to Synergy restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

<u>**JURY DEMAND**</u>

Plaintiff demands a trial by jury.

Dated: June 8, 2018                                    LAW OFFICE OF THOMAS G. AMON

                                                       _____
                                                       THOMAS G. AMON

                                                       733 3rd Avenue, 15th Floor
                                                       New York, NY 10017
                                                       Telephone: (212) 810-2430
                                                       E-mail: tamon@amonlaw.com

                                                       ROBBINS ARROYO LLP
                                                       BRIAN J. ROBBINS
                                                       FELIPE J. ARROYO
                                                       SHANE P. SANDERS
                                                       600 B Street, Suite 1900
                                                       San Diego, CA 92101
                                                       Telephone: (619) 525-3990
                                                       Facsimile: (619) 525-3991
                                                       E-mail: brobbins@robbinsarroyo.com
                                                               farroyo@robbinsarroyo.com
                                                               ssanders@robbinsarroyo.com

                                                       Attorneys for Plaintiff

1263124

## VERIFICATION

I, Robert Davydov, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:  06 - 06 - 18

ROBERT DAVYDOV